Richard ROONEY, Plaintiff,

v.

Kenneth APFEL, Commissioner of Social Security, Defendant.

No. 00–CV–2961(ADS).

United States District Court, E.D. New York.

Aug. 14, 2001.

Sher, Herman, Bellone & Tipograph, P.C., New York City, By Peter S. Tipograph, of Counsel, for the Plaintiff.

Alan Vinegard, United States Attorney, Eastern District of New York, Brooklyn, NY, By Beth P. Schwartz, Assistant United States Attorney, for the Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff, Richard Rooney ("Rooney"), commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), seeking review of a final administrative determination of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Social Security Disability Insurance Benefits. In particular, Rooney challenges the Commissioner's finding that he was not "disabled" as that term is defined in the Act. At issue are the cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

### I. BACKGROUND

#### A. Procedural History

On December 30, 1997, Rooney filed an application for Social Security Disability Insurance benefits. His application was denied, both initially on March 11, 1998, and on reconsideration on June 10, 1998. Rooney's request for an administrative hearing was granted. The hearing was held on February 22, 1999 before an Administrative Law Judge ("ALJ"). The

ALJ found that Rooney was not entitled to disability insurance because his injuries did not rise to the level of a disability within the meaning of the Act. In particular, the ALJ determined that Rooney could perform sedentary work. On March 21, 2000, the Appeals Council denied Rooney's request for review. He commenced this action on December 22, 2000, seeking a review of the Commissioner's decision.

### (i) The Plaintiff's Testimony at the Hearing

Rooney was born on June 7, 1950 and is now 51 years of age. He possesses a High School Equivalency Certificate. Rooney was employed by the New York City Department of Sanitation for twenty-three years. During that time, he rode on the back of a sanitation truck and performed both cleaning and collection tasks.

On September 25, 1991, Rooney stepped into a water-filled pothole while he was working. He suffered severe pain in his left knee and was unable to return to his duties as a sanitation worker. At the hearing, Rooney said that his doctor prescribed a knee brace, which he wears while walking and driving. He was wearing the brace at the hearing.

It appears from the record that Rooney did not work at all for the two-to-three years following his accident. Thereafter, the Department of Sanitation placed him on light duty, which entailed answering the phones. Rooney testified that he could not perform this work either, because sitting for long periods of time caused his knee to throb. He also stated that the act of rising from his chair and walking to find people to pick up the phone was very painful. He claimed that when he stands up, his knee "slips and slides." Rooney further stated that he feared slipping on the oil and grease that was on the floor at work. Accordingly, on an unspecified date, Rooney discontinued performing light duty at the Department of Sanitation. Rooney explained that he spends his days on the first floor of his house where he reads, watches TV, and rests in bed.

According to Rooney, the pain in his left knee has caused him to place more of his weight on the right leg, which has caused pain in the right knee. He claimed that the limping has caused him to be "out of alignment," which has caused his back to hurt. Rooney said that doctors have operated on his left knee twice, but the condition of the knee has not improved. Rooney further stated that a doctor discussed the possibility of a total knee replacement. However, Rooney has thus far refused such an operation, because he fears that his body will reject the artificial joint, and he does not want to have the joint replaced every 10 years.

Rooney stated that he had been receiving Accident Disability Retirement benefits since approximately June, 1995. Although the record is vague as to the source of these disability benefits, it appears that they originate from the New York City Department of Sanitation.

### (ii) The Medical Evidence

#### (a) *Dr. Barry Fisher*

Rooney was initially seen by Dr. Barry Fisher, an orthopedist, who recommended a magnetic resonance imaging scan ("MRI") of Rooney's left knee. The MRI scan was performed on November 5, 1991, and it showed that Rooney had sustained a Grade 3 tear of the posterior horn of the medial meniscus. Although the record is unclear as to the precise date, at some point between November 5, 1991, and September 9, 1992, Dr. Fisher performed an arthroscopic evaluation of Rooney's knee.

(b) *Dr. Mitchell Goldstein*

On September 9, 1992, Rooney was seen by Dr. Mitchell Goldstein ("Dr. Goldstein"), who is an orthopedist specializing in sports medicine. In Dr. Goldstein's note from that initial visit, he wrote that Rooney had been out of work since the date of the accident, and that despite the arthroscopy, Rooney continued to experience joint pain and stiffness, locking and clicking sensations, and difficulty squatting, walking, and holding his one-year-old child. Dr. Goldstein observed mild genu varum, posterior medial joint line tenderness, and three-quarters of an inch of atrophy in the left knee when it was compared to the right knee. Dr. Goldstein also noted a positive Apley grind test and recommended a follow-up MRI and extensive formal physical therapy. He discussed with Rooney the possibility of another arthroscopic evaluation.

On September 30, 1992, Rooney underwent a second MRI scan. The results of the scan showed a torn medial meniscus and a possible tear of the anterior cruciate ligament ("ACL").

Rooney saw Dr. Goldstein on October 14, 1992, and again on November 11, 1992. During both visits, Dr. Goldstein noted that Rooney continued to experience pain in his left knee and difficulty walking. Rooney also had a positive Apley grind test. Although Dr. Goldstein and Rooney discussed the surgical options, Rooney continued non-surgical management.

On February 2, 1993, Dr. Goldstein wrote a treatment note stating that Rooney's left knee was still causing him pain. Dr. Goldstein also wrote that Rooney was experiencing locking and buckling sensations in his left knee. The Apley grind and McMurray tests were both positive. Dr. Goldstein recommended that Rooney undergo a second arthroscopic evaluation.

Rooney saw Dr. Goldstein again on May 12, 1993, and the doctor noted that his patient continued to have pain in his left knee and difficulty walking. Dr. Goldstein discussed the upcoming surgical procedure with Rooney.

On May 17, 1993, Dr. Goldstein performed a left knee arthroscopy, partial medial meniscectomy, and chondroplasty of the medial femoral condyle and the medial tibial plateau. The postoperative diagnosis was internal derangement of the left knee, a torn medial meniscus, and chondral lesions of the medial tibial plateau and femoral condyle.

During the June 16, 1993 follow-up visit with Dr. Goldstein, Rooney said that he had the same pain and buckling in his left knee and the same difficulty walking and squatting as he did before the operation. Dr. Goldstein noted that Rooney was wearing an ACL brace and had an antalgic gait. The doctor recommended that Rooney continue physical therapy.

From July 21, 1993 through June 28, 1995, Rooney saw Dr. Goldstein ten times. Each of the ten treatment notes states that Rooney continued to complain about pain and buckling in his left knee as well as difficulty walking, bending, and rising from a seated position. Dr. Goldstein recommended physical therapy at each of the visits. The record does not specifically indicate that Rooney underwent the recommended physical therapy. However, Dr. Goldstein's notes state that Rooney "continue with his therapy program," which statement indicates that Rooney told Dr. Goldstein that he was following the prescribed physical therapy regimen.

In his note regarding the September 29, 1993 follow-up visit, Dr. Goldstein wrote that Rooney "[c]ontinues to be disabled." In a letter dated October 25, 1993 and addressed "To Whom It May Concern," Dr. Goldstein advised that Rooney was

"permanently and totally disabled from doing his job as he is unable to push pull, lift, or carry." The doctor reiterated this conclusion in a similar letter dated February 16, 1994.

Following a November 2, 1994 visit, Dr. Goldstein concluded, "Due to persistent symptoms, [Rooney] still remains permanently disabled from his job." In his March 1, 1995 treatment note, Dr. Goldstein opined that Rooney "is still unable to work because of this." Then, after a June 28, 1995 visit, Dr. Goldstein reiterated his finding that "[d]ue to persistent symptoms, patient is still disabled from his job."

Dr. Goldstein did not see Rooney again until March 1, 1999. During the examination on that date, the doctor observed that Rooney displayed three-quarters of an inch of atrophy in his left quadriceps; a positive Apley grind test; retropatellar tenderness; pain with sitting; medial and lateral joint line tenderness; a negative Lachman and anterior drawer test; range of motion of zero to 110 degrees; an antalgic gait; and an inability to squat past 60 degrees. An X-ray performed on the left knee revealed "mild tricompartmental arthritis with slight spurring, particularly the tibial spine and the medial aspect lateral femoral condyle."

Dr. Goldstein also observed that Rooney's right knee exhibited mild joint line tenderness and retropatellar tenderness; negative Apley grind, Lachman, and anterior drawer tests; and a range of motion of zero to 130 degrees. The doctor further noted that Rooney's spine was slightly tender.

Dr. Goldstein concluded that Rooney had osteoarthritis of the left knee that had caused permanent loss of range of motion and functional difficulties including sitting, standing, carrying, walking, and going up and down stairs. The doctor stated that at some point in the future, Rooney will require a total knee replacement. He further opined that the injury to Rooney's left knee and the consequential right knee and lower back pain have rendered him "disabled from returning to his employment."

#### (c) *Dr. Dan Goldstein*

On April 27, 1995, Dr. Dan Goldstein ("Dr. D. Goldstein"), another orthopedist, examined Rooney at the request of Dr. R. Obas, the Medical Director of the New York City Department of Sanitation. Dr. D. Goldstein observed that Rooney was wearing a knee brace and was walking with a cane. Dr. D. Goldstein's physical examination of Rooney revealed that Rooney's spine was symmetrical when he was standing, and he had no limitation in trunk mobility. Rooney could stand on his heels and on his toes. He had normal alignment of the bilateral lower extremities and full range of motion in both hips and ankles. The range of motion in flexion in his left knee reached 110 degrees and his right knee reached 130 degrees. The circumference of Rooney's left leg was one-half inch smaller than the circumference of his right leg at six inches above the patella, and at the mid-patellar level. The circumference of Rooney's legs at six inches below the patella was the same.

Further examination of Rooney's left knee showed no increase in volume and no joint effusion. Rooney displayed some tenderness to palpation of the left medial joint line, but no pain was noted over the lateral joint line or the collateral ligaments. He also showed tenderness to palpation of the undersurface of the patella and at compression of the patella into the femoral groove throughout range of motion.

A varus-valgus stress test for ligamentous instability of the left knee was negative in full extension and in thirty degrees

of flexion. A Lachman test was negative and McMurray test results were questionable. The Apley grind test was positive.

Dr. D. Goldstein also reviewed Rooney's past medical records, including progress notes from the Sanitation Clinic from October 25, 1991 through April 13, 1993; treatment notes from Dr. Goldstein from October 14, 1992, February and November 1994; an MRI report from Dr. Harkavy; and a chart from Nassau Community Hospital that contained the report of Rooney's arthroscopy and post-operative diagnosis.

Based on his physical examination of Rooney and his review of Rooney's medical records, Dr. D. Goldstein concluded that Rooney sustained an internal derangement with a torn medial meniscus as a result of his accident of September 25, 1991. Dr. D. Goldstein wrote that Rooney required orthopedic observation every two to three months but should be able to return to light work on a desk job. Dr. D. Goldstein recommended that Rooney not partake in lifting, carrying, pushing, or standing on his feet for long hours.

### (d) The Medical Board

On June 29, 1995, the Medical Board for the New York City Employees' Retirement System ("Medical Board") examined and interviewed Rooney in connection with a request by the New York City Department of Sanitation that Rooney be approved for Accident Disability Retirement. The Medical Board observed that Rooney walked with a normal gait and did not limp, regardless of whether he was walking on his heels or toes. Although Rooney was able to squat to ninety degrees without the presence of crepitus, he did complain of pain on full extension. No mediolateral instability was noted, and a Lachman test was negative. The range of motion in Rooney's left knee was 130 degrees compared with 132 degrees in his

right knee. On full flexion of the left knee with tibial rotation, a click was noted along the medial joint line. Patellar compression produced some intermittent pain. There was no joint effusion. The following comparative measurements were taken:

| | Right | Left |
|---|---|---|
| Thigh | 52 cm. | 53 cm. |
| Knee | 43.2 cm. | 43.0 cm. |
| Calf | 39.2 cm. | 39 cm. |
| Foot | 28.5 cm. | 27.5 cm. |

The Medical Board concluded that Rooney had findings consistent with a moderate disability, which precluded his return to full duty as a sanitation worker. The Medical Board recommended approval of the New York City Department of Sanitation's request for Accident Disability Retirement for Rooney.

### (e) Dr. Ayyub and Dr. H. Heimowitz

On February 5, 1998, Dr. Rashid Ayyub examined Rooney and sent a written report to the Office of Disability Determinations of the New York State Department of Social Services. The record does not indicate the type of medicine practiced by Dr. Ayyub. During the examination, Rooney complained of severe pain, intermittent clicking, and swelling in both knees. He also said that he developed back pain radiating down to both lower extremities and was taking Tylenol for the pain. Dr. Ayyub observed that Rooney was using a cane to walk and that he wore a knee brace for support. Although Rooney walked without the cane, he had a noticeable limp. Dr. Ayyub noted that Rooney's daily activities were confined to watching television, reading the newspaper, going for short walks, and very light work at home.

Examination by Dr. Ayyub revealed normal flexion, extension, lateral flexion and lateral rotation of the cervical spine. The doctor noted no cervical or paracervical

pain or spasm. In addition, Rooney had full range of motion in his shoulders, elbows, forearms, wrists and fingers. Dr. Ayyub stated that there was no motor or sensory abnormality in Rooney's upper extremities.

Dr. Ayyub observed tenderness and muscle spasm in the lumbar spine but no deformity. He also noted that forward flexion was possible up to 70 degrees and extension to 20 degrees. Dr. Ayyub found no atrophy or motor or sensory abnormality of the lower extremities.

The doctor observed moderate swelling of the left knee as well as well as some loss in its range of motion. Dr. Ayyub also heard multiple clicks on flexion and extension. The doctor saw that the right knee was markedly swollen with multiple clicks but was capable of full extension.

Dr. Ayyub diagnosed Rooney as suffering from ligamentous and cartilaginous injury to both knees, lumbar radiculopathy, and bilateral sciatica. He indicated that Rooney might require arthroscopic surgery on his right knee in the future. He opined that Rooney could sit for two to four hours, stand for forty-five to ninety minutes, and walk two to five blocks with the help of his cane, knee brace, and frequent rests. In addition, he concluded that Rooney could lift up to approximately fifteen pounds.

Dr. H. Heimowitz, a radiologist, read X-rays of Rooney's knees and lumbosacral spine in connection with the examination and report prepared by Dr. Ayyub. Dr. Heimowitz concluded that the X-rays of Rooney's knees demonstrated generalized joint space narrowing and a possible loose body in the left knee. The X-rays of the lumbosacral spine also revealed generalized disc space narrowing.

### (f) Dr. Kaye and Dr. Buoncore

Dr. Alan Kaye and Dr. Anthony Buoncore are state agency consultative physicians, whose specialties are not mentioned in the record. On March 10, 1998, they issued a "Physical Residual Functional Capacity Assessment" of Rooney. This opinion was based solely on a review of Rooney's medical records; the doctors did not examine the patient. The doctors agreed that in an eight-hour workday, Rooney was capable of occasionally lifting up to ten pounds and frequently lifting more than ten pounds in an eight-hour workday. They also found that he could stand and/or walk with normal breaks for at least two hours in an eight-hour workday and could sit for approximately six hours in an eight-hour workday with normal breaks. They further concluded that Rooney's ability to push and pull was unlimited.

### (g) The Disability Determination and Transmittal

The Social Security Administration issued a Disability Determination and Transmittal, dated March 10, 1998 and a Notice of Disapproved Claim dated March 11, 1998, that denied Rooney's application for disability benefits. In particular, the Administration found that Rooney was not disabled, because based upon his age, education, and work experience, Rooney could perform sedentary work, such as work that involves occasional walking and standing and lifting a maximum of 10 pounds. Accordingly, Rooney's condition was "not severe enough to keep [him] from working."

As noted above, Rooney applied for reconsideration of this initial decision. On June 8, 1998, the Social Security Administration issued a Disability Determination and Transmittal regarding the reconsideration application, and on June 10, 1998, the Administration issued a Notice of Recon-

sideration. Both documents reiterated the Administration's previous conclusion that Rooney was not disabled, because although Rooney is no longer able to perform certain types of work, he can perform sedentary work. Accordingly, the Social Security Administration denied Rooney's request for reconsideration.

## B. The ALJ's Findings

The ALJ determined that Rooney has "severe impairments consisting of mild arthritis in the left knee secondary to surgery performed to repair cartilage and ligamental damage, and internal derangement of the right knee and back since February 5, 1998." Given that injury, the ALJ found that Rooney could no longer perform the very heavy demands of his former sanitation work.

However, the ALJ concluded that Rooney can sit for six hours, stand and walk for two hours and lift and carry small items frequently and ten pounds occasionally. The ALJ noted that none of the evidence suggested future surgery was necessary. The ALJ held that in light of the fact that Rooney spends his time, reading, watching television, taking short walks, spending time with his young children, and driving short distances, he could also perform the physical tasks associated with sedentary work, including sitting for a significant period of time, standing and walking for short periods of time, and lifting and carrying minimal weights.

The ALJ also noted that Dr. Goldstein's conclusion that Rooney is "totally and permanently disabled from performing his job" clearly precludes Rooney from performing his former job, but does not necessarily preclude Rooney from performing sedentary or light work. The ALJ accorded considerable weight to this opinion, because Dr. Goldstein is a specialist who saw Rooney every four-to-six weeks for four years and whose opinion is supported by the medical findings and treatment course.

The ALJ stated that Dr. D. Goldstein had opined that Rooney could work at a desk. The ALJ accorded this opinion considerable weight as well, because although it was based on a single examination of Rooney, the opinion was within Dr. D. Goldstein's area of expertise, which was orthopedics, was made after the second arthroscopic evaluation, and was consistent with the medical findings and course of treatment.

The ALJ stated that the Medical Board for the New York City Employees' Retirement System ("Medical Board") had opined that Rooney had a moderate disability that precluded him from performing his full job duties. The ALJ noted that this opinion was based on an independent examination of Rooney as well as a review of his medical records. The ALJ found that the Medical Board's opinion could reasonably be interpreted to mean that Rooney could perform light or sedentary work. The ALJ noted that the opinion was supported by the medical findings. However, the ALJ gave the opinion limited weight due to the nature of the relationship between the doctors and Rooney, and the fact that the opinion was based on a single examination of the patient. The ALJ did not expand upon the "nature of the relationship between the[ ] doctors and the claimant." However, the Court notes that the doctors on the Medical Board and Rooney all worked for the New York City Department of Sanitation.

The ALJ did not credit Rooney's subjective allegations, because Rooney has not sought treatment for the injury to his left knee in over three years and never sought medical treatment for the pain in his right knee and lower back. The ALJ further noted that Rooney takes only over-the-counter pain medication and can walk and change positions with the help of a cane

and brace. The ALJ also stated that there is no indication that the cane is even medically necessary. The ALJ found Rooney's testimony to be inconsistent with the medical evidence, because Rooney complained of swelling, buckling, and pain in his left knee; however, swelling was only seen only once in a clinical examination, and instability was never noted.

The ALJ held that the only opinion that supported Rooney's testimony was that of Dr. Ayyub, whom the ALJ said had opined that Rooney "could sit up to four hours, stand up to ninety minutes, walk up to five blocks, and lift and carry up to fifteen pounds." The ALJ found that although Dr. Ayyub did not specifically identify the type of work Rooney could and could not perform, the doctor's opinion regarding Rooney's functional capacity effectively precluded Rooney from performing a "wide range of sedentary work." The ALJ accorded Dr. Ayyub's opinion limited weight, because it was based on a single examination of Rooney and contradicted the opinion of the treating specialist, the medical findings, the conclusions of other experts, and the course of treatment. The ALJ did not explain how Dr. Ayyub's opinion contradicted that of the treating physician. The ALJ further held that even if he accorded the opinion considerable weight, "it would not outweigh the combined impact of the [other] medical opinions."

In light of the foregoing and based on Rooney's age and education, the ALJ concluded that Rooney's impairment did not direct a finding that he was disabled under Table 1 of Appendix 2, Subpart P, Part 404 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of Impairments).

## II. DISCUSSION

### A. Legal Standard

■ This Court reviews the Commissioner's decision to determine whether (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). It means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Brown,* 174 F.3d at 62–63. "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)).

■ The Court also must "keep[ ] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security,* 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)).

### B. Availability of Benefits

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To be eligible for disability benefits under the Act, Rooney

must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

■ The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. As the Second Circuit recently explained:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the Regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commis-

sioner] then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir.1998); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998). The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof as to the fifth step. *See Schaal*, 134 F.3d at 501 (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996); 20 C.F.R. §§ 404.1520, 416.920).

To meet his burden of proof on the fifth step, the Commissioner may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids." The grids

> take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations that significantly diminish her capacity to work.

*Rodriguez v. Apfel*, 1998 WL 150981 (S.D.N.Y.1998) (citations omitted). There are five levels of exertion which are derived from the grids: sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 200.00–204.00. These criteria are used to determine what level of exertion a claimant is capable of performing in an occupational setting.

Proceeding through the five-step analysis, the Commissioner must consider the complete record, including any objective medical evidence, as well as the claimant's subjective statements concerning his impairments, restrictions, daily activities and any other relevant statements. *See Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir.1984). However, and significantly, the Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 119 (2d Cir.1998). The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993). The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions by your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In analyzing a treating physician's report, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa*, 168 F.3d at 79; *see Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998).

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner applies various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. Those factors include:

> (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

Applying these standards to the facts of this case, the Court finds that although the ALJ's conclusion may be correct, the case must be remanded to the ALJ for further proceedings, because the ALJ did not properly apply the treating physician rule. In particular, the ALJ accorded Dr. Goldstein's opinion "considerable weight" as opposed to "controlling weight." "Considerable weight" was the same weight the ALJ assigned to the opinion of Dr. D. Goldstein, the orthopedist who examined Rooney only once. The ALJ also failed to set forth how Dr. Goldstein's opinion was unsupported by the medical findings; how it was inconsistent with other substantial record evidence; and the reasons supporting the decision not to give the opinion controlling weight. *See Shaw*, 221 F.3d at 134; *Rosa*, 168 F.3d at 79; *Clark*, 143 F.3d at 118. Moreover, the record contains no indication that Dr. Goldstein's observations were unsupported by medical evidence or that his opinion is inconsistent with the record as a whole. *See Shaw*, 221 F.3d at 134. Accordingly,

the ALJ erred in not giving the opinion controlling weight.

In addition to giving "considerable" as opposed to "controlling" weight to Dr. Goldstein's opinion, the ALJ also ignored many of Dr. Goldstein's medical findings. In particular, in concluding that Rooney was not disabled, the ALJ disregarded Dr. Goldstein's March 1, 1999 finding that Rooney had osteoarthritis of the left knee that had caused permanent loss of range of motion and functional difficulties, including sitting, standing, carrying, walking, and going up and down stairs. The ALJ also declined to mention Dr. Goldstein's opinion that Rooney would require a total knee replacement in the future. Rather, in support of his decision not to credit Rooney's subjective allegations, the ALJ stated, "there is no evidence that the claimant currently needs more surgical intervention (the treating doctor only speculates a future possibility)." Had the ALJ accorded controlling weight to these opinions, he may have concluded that Rooney's severe impairment rose to the level of those described in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.03.

When performing the fourth step of the analysis outlined in 20 C.F.R. §§ 404.1520, 416.920, the ALJ gave Dr. Goldstein's opinion controlling weight. Dr. Goldstein repeatedly opined that Rooney was totally and permanently disabled from performing his job, and the ALJ determined that Rooney did not have the residual functional capacity to perform his duties as a sanitation worker.

However, the ALJ again violated the treating physician rule when he performed the final step of the analysis. When the ALJ concluded that Rooney could perform sedentary tasks, he ignored Dr. Goldstein's opinion that Rooney was "permanently and totally disabled from doing his job." Further, to the extent that the ALJ consid-

ered Dr. Goldstein's opinion, he neglected his duty to develop the factual record in regard to finding whether there was other work Rooney could perform. *See Shaw,* 221 F.3d at 134 (describing ALJ's duty to develop the factual record).

The Court notes that Dr. Goldstein's opinion as to Rooney's work capacity is somewhat vague and ambiguous. He states that Rooney is totally and permanently disabled to return to his job. As the ALJ stated, this opinion could be interpreted to mean that Rooney is physically unable from returning to his job as a sanitation worker but could perform some sedentary work. However, it is not the role of the ALJ "to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Shaw,* 221 F.3d at 134 (citing *Balsamo,* 142 F.3d at 81). Thus, rather than interpreting what he thought Dr. Goldstein meant, the ALJ was obligated to clarify the statement by *sua sponte* seeking additional information from Dr. Goldstein. *See Schaal,* 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician *sua sponte* ]"); *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996) ("[T]he rule in our circuit [is] that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'") (citations omitted).

Similarly, the ALJ erred in finding that Rooney could sit for six hours, stand and walk for two hours and lift and carry small items frequently and ten pounds occasionally. These functional capacity conclusions were made by Dr. Kaye and Dr. Buoncore, physicians whose specialities are unknown and who never treated Rooney. Dr. Goldstein never made specific findings as to the amount or type of sedentary work Rooney could perform.

Rather, he concluded that Rooney was totally and permanently disabled. Thus, by relying on the functional conclusions of Dr. Kaye and Dr. Buoncore to reach his conclusion that Rooney was capable of engaging in some kind of "substantial gainful work which exists in the national economy," 42 U.S.C. § 423(d)(2)(A), the ALJ violated the treating physician rule and failed to perform his duty to obtain functional capacity information from Dr. Goldstein.

For the foregoing reasons, the Court finds that this case must be remanded to the ALJ for the purposes of: (1) clarifying Dr. Goldstein's opinion that Rooney is totally and permanently disabled from performing his job; (2) obtaining an opinion from Dr. Goldstein regarding whether Rooney can perform light or sedentary work and, if so, how much and in what manner; (3) perhaps, subject to the ALJ's discretion, obtaining an opinion from an impartial orthopedic surgeon specializing in knee injuries as to the type of light duty or sedentary work Rooney can perform, if any; and (4) applying the treating physician rule to the five-step analysis outlined in 20 C.F.R. §§ 404.1520, 416.920.

The Court notes that the ALJ may, in fact, reach the same conclusion on remand. Rooney tore his medial meniscus 10 years ago. He underwent two arthroscopic surgeries and now suffers from mild arthritis. The bottom line is that Rooney has a bad knee and some residual pain which has apparently affected his right knee and lower back. Using common sense and looking at the record as a whole, the Court could reasonably conclude that someone who is 51 years of age and who has Rooney's ailments can perform some kind of light work or a desk job. It appears that Rooney does similar acts at home. But, the role of this Court is not that of a doctor. Rather, this Court must examine whether the ALJ applied the correct standards. The Court finds that, in this situation, the ALJ failed to do so, because he did not correctly apply the treating physician rule and did not fulfill his obligation to develop the record fully. Accordingly, the Court grants the plaintiff's motion and remands the case to the ALJ.

## III. CONCLUSION

Having reviewed the parties' submissions, and for the reasons set forth above, it is hereby

**ORDERED**, that Rooney's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is **GRANTED**; and it is further

**ORDERED**, that the Commissioner's cross-motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is **DENIED**; and it is further

**ORDERED**, that this case is remanded to the ALJ for further proceedings not inconsistent with this opinion and in particular for the purposes of: (1) clarifying Dr. Goldstein's opinion that Rooney is totally and permanently disabled from performing his job; (2) obtaining an opinion from Dr. Goldstein regarding whether Rooney can perform light duty or sedentary work and, if so, how much, and in what manner; (3) perhaps, in the discretion of the ALJ, obtaining an opinion from an impartial orthopedic surgeon specializing in knee injuries as to the type of light duty or sedentary work Rooney can perform, if any; and (4) applying the treating physician rule to the five-step analysis outlined in 20 C.F.R. §§ 404.1520, 416.920; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**